**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 05-21395-CIV-SEITZ/MCALILEY

GEORGE POWELL et al.,

       Plaintiffs,

v.

CAREY INTERNATIONAL, INC., et al.,

       Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the parties' cross motions for summary judgment primarily on the issue of damages, [DE 272, 274]. The parties' dispute two critical components for determining the amount of overtime wages. First, they disagree as to the applicable regulation for determining their regular hourly rate of pay -- whether 29 C.F.R. § 778.109 applies because Plaintiffs were paid in multiple ways, which results in *time and half overtime pay*, or whether 29 C.F.R. § 778.112 applies because Plaintiffs were paid by the job, which results in *half overtime pay*. Second, they contest which work activities are compensable, which determines the number of hours worked per week, which in turn is divided into the weekly compensation to ascertain the regular hourly rate of pay.

Having reviewed the motions, the responses and the replies thereto, the entire factual record and the relevant legal authorities, the Court finds that pursuant to § 778.112, Plaintiffs' are compensated on a per job basis. Therefore, any overtime hours worked are compensated at one half of the hourly rate of pay multiplied by the number of hours worked overtime. The per job pay

consists of the base percentage plus the fixed gratuity with expenses for tolls, parking fees and fuel surcharges netted out.  Additionally, the Court finds that Plaintiffs are entitled to be compensated for the following activities: driving with customers in the vehicle, driving between jobs, attending mandatory meetings, waiting for customers or being engaged to wait, and waiting for no-shows or cancellations.  Plaintiffs are not entitled to be compensated for commutes between work and home and time spent changing clothes.  Also, the I/Os are not entitled to compensation for time spent cleaning, inspecting or maintaining their vehicle.  Furthermore, issues of fact remain as to the compensability of the following activities: the time spent obtaining and placing amenities in vehicles; the time that Carey House Chauffeurs spent cleaning, inspecting and maintaining the Defendants' vehicles; the time spent calling dispatch and checking flight times; and the time spent "waiting to be engaged."  In addition, as a matter of law, Plaintiffs are not entitled to social security payments or compensatory damages for minimum or overtime wage claims.  Finally, Defendants are not entitled to summary judgment regarding Plaintiff Powell's retaliation claim.

## I.    BACKGROUND

Plaintiffs, limousine drivers, seek overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., from three Defendants, who were involved in the limousine transport business at the time relevant to this lawsuit.[1]  After extensive procedural activities, both the Plaintiffs and Defendants seek summary judgment as to the calculation of the overtime hourly wage and the determination of which activities are compensable.  The parties set forth the

---

[1]  A case substantially identical to this one, involving similar plaintiffs and the same defendants was recently litigated in this District, *Foody v. Carey International, Inc.*, *et al.*, 04-21104-Ungaro-Benages.  Based on the thorough and well-reasoned analysis of Judge Ungaro-Benages, the overwhelming factual similarities between the two cases and the need for consistent treatment of like cases in this unique area of FLSA jurisprudence, the *Foody* decision is the point of departure for this Court's analysis.

following facts.

Defendant Carey International, Inc. owns a number of subsidiary corporations that engage in limousine services. One of Carey International's subsidiaries is Defendant Carey Limousine Florida, Inc. (d/b/a Carey South Florida and successor in interest to Campanile Motor Services, Inc. and Club Limousine Service, Inc.). (Affidavit of Robert Michael Sobol ("Sobol Decl."), December 1, 2006, ¶ 2). Defendant Vince Wolfington is the former Chief Executive Officer of Carey International, Inc. Throughout this Order, the term Defendants shall collectively refer to Carey International, Inc., Carey Limousine Florida, Inc. and Vincent Wolfington. Likewise, Defendant Carey Limousine Florida, Inc., when discussed individually, shall be referred to as Carey South Florida.

Plaintiffs are drivers who worked for and were paid by Carey South Florida to provide chauffeur services to Defendants' customers in South Florida. (*See* Fourth Amended Complaint ("FAC") ¶ 1.) Plaintiffs can be divided into two groups: those who own their vehicle ("I/Os") and those who use the vehicles owned or leased by Defendants ("Carey House Chauffeurs").[2] (Sobol Decl. ¶ 3.) The Plaintiffs claim that they were employees for the purposes of the FLSA and, therefore, were entitled to overtime wages at the statutory rate for all compensable time worked.[3] As part of their claims, Plaintiffs maintain their compensable hours should include the time spent adhering to Defendants various requirements concerning personal appearance, grooming, dressing,

---

[2] Until November 2004, Carey South Florida classified Carey House Chauffeurs as independent contractors who drove vehicles owned or leased by Carey South Florida. After November 2004, Carey South Florida started to convert the existing Carey House Chauffeurs to employees. (*Id.* ¶¶ 5-6.) For purposes of this Order, the collective "Plaintiffs" refers to both categories of limousine drivers. Where the status as an I/O as compared to a Carey House Chauffeur, is relevant as a matter of law, such distinction will be noted.

[3] Defendants have chosen not to challenge whether Plaintiffs are employees as opposed to independent contractors.

as well as vehicle maintenance, including placing the required supplies in the car.  (Plaintiffs'
Statement of Facts ("Plaintiffs' SOF") ¶ 1.)  Plaintiffs also assert that they were required to contact
dispatch prior to leaving their house.  (Plaintiffs' SOF ¶¶ 4-5.)

Michael Sobol, the Vice President and General Manager of Carey South Florida, has
described the manner in which Defendants assert that Plaintiffs were compensated each month.[4]
(*Id*. ¶ 9, 13.)  Both Plaintiff groups received a percentage of the adjudged gross revenue that Carey
South Florida received from a limousine customer for a particular trip.  Those Plaintiffs who were
Carey House Chauffeurs received 18% of the adjusted gross revenue received from the customer
for a particular trip, plus a pre-determined gratuity (20%), plus any cash gratuity paid by the
customer .  (*Id*. ¶ 9.)  The Plaintiffs who were I/Os received 60% of the adjusted gross revenue
received from the customer for a particular trip, plus a pre-determined gratuity, plus any cash
gratuity paid by the customer.  (*Id*. ¶ 13.)  The adjusted gross revenue is equal to the base rate
charged to the customer less taxes, surcharges, commissions, discounts, rebates, tolls, parking and
credit card fees.  (*Id*.)  I/Os also had a contractual obligation to maintain their vehicles in a safe,
clean and presentable condition and the vehicle had to be no more than three years old.  (*Id*. ¶ 16.)
The I/Os were responsible for all fees and expenses incurred in the operation and maintenance of
their vehicles, including expenses such as gas, licences, vehicle maintenance and repairs, parking,
traffic citations and permits.  (*Id*. ¶ 18.)  Further, I/Os were required to pay for supplies, such as

---

[4]  Plaintiffs state that they were compensated under the same base percentage methodology described in
Sobol's declaration (Plaintiffs' SJ Motion at 1; Plaintiffs' SOF ¶ 3.), although, they also state that they did not know
how much they were going to be paid for any one job.  (Plaintiffs' SJ Motion at 4.)  Thus, there appears to be no
factual dispute that Plaintiffs were aware that they were paid a percentage of the amount charged to the limousine
customer, but did not know how exactly how much they were to be paid because they were not aware of how much
Defendants charged customers.

clothing, radios, cellular phones, beepers, umbrellas, water, magazines, candy, newspapers, and any other amenities that they chose to provide to customers.  (*Id.* ¶ 20.)  The customers were required to pay for parking and tolls, and these expenses were often advanced by the I/O during the trip.  (*Id.* ¶ 22.)  The I/O was then reimbursed when the customer paid Carey South Florida.  (*Id.*)  Also, since June 1, 2004, customers had been required to pay a fuel charge to off-set escalating fuel prices.  (*Id.* ¶ 22.)  The fuel surcharge was then paid to the I/O.  (*Id.*)

Plaintiffs assert that in addition to being paid the fixed base percentage of the adjusted gross revenue and the gratuities, they were also paid as compensation the fuel surcharge, and hourly payments for stand-by situations, miscellaneous occurrences and wait times, and "as directed" jobs.  (Plaintiffs' SOF ¶¶ 15-20.)

Each I/O's revenues and expenses were reconciled once a month and recorded in an Account Liquidation Report (the "Report").  (*Id.* ¶ 25.)   The Report identified the vehicle revenue and fees due to the I/O ("Total Fees Due") and then subtracted all expenses that the I/O owed Carey South Florida, such as fees for creditors or vendors ("Total Deductions").  (*Id.* ¶¶ 28-29.)  Subtracting the Total Deductions from the Total Fees Due resulted in the Net Fees Due.  (*Id.* ¶ 29.)  Gratuities are then added to the Net Fees Due which then resulted in the Total Payment Amount to the I/O.  (*Id.* ¶ 31.)  Finally, Defendants kept track of the hours that Plaintiffs worked as they performed their trips.  (*Id.* ¶ 35.)

## II.    STANDARD OF REVIEW

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits," show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Supporting and

opposing affidavits must be made based upon personal knowledge.  Fed. R. Civ. P. 56(e).  The

Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), that when

assessing whether the movant has met this burden, the court should view the evidence and all

factual inferences in the light most favorable to the party opposing the motion.

    The party opposing the motion may not simply rest upon mere allegations or denials of the

pleadings; after the moving party has met its burden of coming forward with proof of the absence

of any genuine issue of material fact, the non-moving part must make a sufficient showing to

establish the existence of an essential element to that party's case, and on which that party will bear

the burden of proof at trial.  *Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club

of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997).

     If the record presents factual issues, the court must not decide them; it must deny the

motion and proceed to trial.  *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.

1981).[5]  Summary judgment may be inappropriate even where the parties agree on the basic facts,

but disagree about the inferences that should be drawn from these facts.  *Lighting Fixture &

Electric Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir. 1969).  By its very

terms, this standard provides that the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986).  The Court is not to resolve factual issues, but may only determine

---

[5]  Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are
binding precedent in the Eleventh Circuit.  *See Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981.)

whether factual issues exist.  *Id.* at 248. A material fact is one which "might affect the outcome of the suit under the governing law . . .." *Id.*

III.    **ANALYSIS**

There are two main issues in the parties' cross-motions for partial summary judgment: the method for computing Plaintiffs' regular hourly rate of compensation and the determination of those tasks for which Plaintiffs are entitled to compensation.[6]  Part A, below addresses the first issue and Part B focuses on the second.

As to the first issue, FLSA administrative regulations provide guidance for determining an employee's regular hourly rate, or Regular Rate, which is a key determination for calculating overtime pay.  The parties rely on different regulations to support their positions.  Plaintiffs argue that 29 C.F.R § 778.109 governs the dispute and results in one of three manners of calculating the Regular Rate.[7] All three of these methods result in the overtime rate being one and a half times the Regular Rate.  In taking these positions, Plaintiffs are arguing against the application of 29 C.F.R. § 778.112, which would result in the overtime rate being only half of the Regular Rate.

In contrast, Defendants claim that Plaintiffs were paid by the job and, therefore, 29 C.F.R § 778.112 applies.  Application of § 778.112 would result in the Regular Rate being the result of

_____

[6]  Defendants also claim that Plaintiffs are not entitled to "social security payments," and that compensatory damages are unavailable for Plaintiffs overtime and minimum wage claims and Plaintiff Powell's retaliation claim.

[7]  The Court has done its best to discern how Plaintiffs calculate the Regular Rate, however, Plaintiffs' claims in this regard are unclear, disorganized and not fully developed.  Notwithstanding the difficulty in interpreting Plaintiffs' allegations, the Court believes the following formulas represent Plaintiffs' three methodologies.  The first method calculates the Regular Rate by dividing the "total remuneration for employment in any workweek" (hereinafter "Weekly Pay") by the 40 hours worked in that week.  Using their second method, Plaintiffs allege that they were only compensated for time in which passengers were in the vehicle, which they estimate was 40% of the time, therefore, the Regular Rate results by dividing the Weekly Pay by an estimated total amount of time that Plaintiffs had passengers in the car.  Third, Plaintiffs state that the Regular Rate can be calculated by dividing the Weekly Pay by the total amount of hours worked.

dividing the Weekly Pay by the total weekly hours that were compensated.  The overtime hourly

rate is then half of the Regular Rate.  29 C.F.R. § 778.112.  Defendants further claim that in

calculating the Regular Rate, such reimbursable expenses as tolls, parking fees and fuel surcharges

must be netted out.

As to the second issue, Plaintiffs assert that they are entitled to compensation for the time

spent doing various activities associated with their job, other than transporting passengers, such as

vehicle maintenance, wait times, cleaning, etc.  Defendants, on the other hand, claim that the time

spent doing activities related to the job such as daily commutes, vehicle maintenance and changing

into uniforms are not compensable under the FLSA.

**A.    The Calculation Of The Regular Rate And The Overtime Hourly Rate.**

The Department of Labor is responsible for promulgating regulations interpreting the

overtime pay requirements under the FLSA and these regulations are entitled to judicial deference

as the primary source of guidance for determining the scope and extent of exemptions to the

statute.  *Spradling v. City of Tulsa*, 95 F.2d 1492, 1495 (10th Cir. 1996).  Exemptions from, or

exceptions to, the statute are narrowly construed against the employer asserting them and it is the

employer's burden to affirmatively show that these exemptions apply in a particular case.  *Coward

v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 264 (5th Cir. 2000).

1.    29 C.F.R. § 778.112, and not § 778.109, Applies Under These Circumstances.

Subchapter B of Title 29 of the Code of Federal Regulations contains statements of general

policy or interpretation promulgated by the Wage and Hour Division of the Department of Labor.

Subpart B of part 778 of Title 29 governs the overtime requirements imposed by the FLSA, and §§

778.107 through 778.122 establish principles for determining the Regular Rate at which an

employee is compensated in order to calculate the overtime pay to which the employee is entitled.

Section 778.107 explains that overtime must be compensated "at a rate of not less than one and

one-half times the regular rate at which he is employed."  29 C.F.R. § 778.107.  Section 778.109,

entitled "The regular rate is an hourly rate," explains:

> The "regular rate" under the [FLSA] is a rate per hour. The [FLSA] does not
> require employers to compensate employees on an hourly rate basis; their earnings
> may be determined on a piece-rate, salary, commission, or other basis, but in such
> case the overtime compensation due to employees must be computed on the basis of
> the hourly rate derived therefrom and, therefore, it is necessary to compute the
> regular hourly rate of such employees during each workweek, with certain statutory
> exceptions discussed in §§ 778.400 through 778.421. The regular hourly rate of pay
> of an employee is determined by dividing his total remuneration for employment
> (except statutory exclusions) in any workweek by the total number of hours actually
> worked by him in that workweek for which such compensation was paid. The
> following sections give some examples of the proper method of determining the
> regular rate of pay in particular instances: (The maximum hours standard used in
> these examples is 40 hours in a workweek).[8]

The sections following § 778.109, however, give some examples of the proper method of

determining the Regular Rate of pay in particular instances.  Defendants maintain that one of these

sections, § 778.112, governs the calculation of wages in this case because Plaintiffs were paid by

the job.  Section 778.112, entitled "Day rates and job rates," provides:

> If the employee is paid a flat sum for a day's work or for doing a particular job,
> without regard to the number of hours worked in the day or at the job, and if he
> receives no other form of compensation for services, his regular rate is determined
> by totaling all the sums received at such day rates or job rates in the workweek and
> dividing by the total hours actually worked. He is then entitled to extra half-time
> pay at this rate for all hours worked in excess of 40 in the workweek.

Thus, under § 778.112, the Regular Rate is determined by taking an employee's Weekly

Pay and dividing it by the total hours that he actually worked.  The employee's overtime hourly

---

[8]  The following formula is used to calculate the Regular Rate under § 778.109:
*Regular Rate = salary for work period / total hours worked in work period*

wage is then *half* of the Regular Rate.[9]  29 C.F.R. § 778.112 (emphasis added).

Plaintiffs make three arguments against the application of § 778.112 in this case:[10] (1) there was no agreement as to the form of payment and Plaintiffs did not know how much they were to be paid for a job; (2) Plaintiffs were not paid for all jobs; and (3) Plaintiffs were not paid by the job, but rather they were paid multiple forms of compensation, including an hourly rate for various activities.

2.      Section 778.112 Does Not Require An Agreement As To The Form Of Payment.

As to Plaintiffs' first argument against the application of § 778.112, the law does not require that Plaintiffs understand that a job-rate cover the hours the job demands.  *Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 268 (5th Cir. 2000) (holding that the plain language of § 778.112 only requires that the employee be paid a day or job rate, not that employee consents to such); *see also Hartsell v. Dr. Pepper Bottling Co. of Tx.*, 207 F.3d 269, 273 (5th Cir. 2000) (holding that the plain language of § 778.112 only requires that the employee be paid by the job, not that employee and employer have a mutual understanding).[11]  Even if the regulation required an agreement as to the manner of compensation, however, the evidence indicates that Plaintiffs were aware of how they would be paid in advance of the job.  (*See* Plaintiffs' SOF ¶¶ 2-3 (indicating that Plaintiffs had knowledge that they were paid a percentage charge and a fixed gratuity.)  Thus,

---

[9]  Defendants contend that reimbursable expenses for tolls, parking fees and fuel surcharges must be netted out of the Weekly Pay prior to calculating the Regular Rate.

[10]  The Court derives Plaintiffs' arguments against the application of § 778.112 from both Plaintiffs' Motion for Partial Summary Judgment Regarding the Calculation of Damages and Plaintiffs' Response in Opposition to Defendants' Motion for Partial Summary Judgment.

[11]  With respect to this argument, Plaintiffs seem to confuse § 778.112 with § 778.114 (the provision regarding compensation through a fixed salary), which requires a clear understanding of the agreement prior to application of the provision.  *See Dufresne*, 207 F.3d at 268.

Plaintiffs' assertion in this regard is without merit.

      3.    <u>The Fact That Plaintiffs May Not Have Been Paid For All Jobs Is Irrelevant To</u>
              <u>The Application Of § 778.112.</u>

Plaintiffs next claim that they did not get paid for all of the jobs.  Such assertion, however, is not determinative of whether § 778.112 applies in this case.  If Plaintiffs were not paid for a particular job, then Plaintiffs are entitled to relief under the appropriate minimum wage statute; however, such fact does not render § 778.112 inapplicable.  Ironically, Plaintiffs assertion that Defendant failed to pay them for certain jobs, implicitly acknowledges that Plaintiffs were in fact paid by the job.

      4.    <u>The Six Different Methods Of Compensation Alleged By Plaintiff Do Not</u>
              <u>Prevent The Application Of § 778.112</u>

Plaintiffs also argue that because they received six different types of compensation, § 779.112's clause barring "other form[s] of compensation" prevents the application of the provision. Plaintiffs allege that the six different types of compensation received include: (1) a paid percentage of the adjusted gross revenue received from the customer (60% to I/Os and 18% to Carey House Chauffeurs); (2) a 20% fixed gratuity;[12] (3) a fuel surcharge paid to I/Os; (4) a payment for stand-by situations and site inspections; (5) a payment for miscellaneous occurrences such as no shows, excessive waits, etc.; and (6) payment for "as-directed" jobs.  As discussed below, none of these arguments, individually or collectively, support Plaintiffs' position.

---

[12]  While Plaintiffs do not list as compensation the cash gratuity received directly from customers, such payment is not relevant because these gratuities do not amount to compensation by Defendants for Plaintiffs' services.  Section 531.60 explains that [s]uch tips are not payments made by the employer to the employee as remuneration for employment within the meaning of the [FLSA.]"

_____(i)     _Fixed Percentage of Adjusted Gross Revenue from Customer_

Plaintiffs are paid a base percentage of adjusted gross revenue received from the customer. Such payment makes up a portion of the "flat sum" for a particular job, to which § 778.112 applies. The I/Os received 60% of the adjusted gross revenue received from a customer for a particular trip plus a pre-determined gratuity, while Carey House Chauffeurs received 18% of the adjusted gross revenue received from a customer for a particular trip plus a pre-determined gratuity.  Accordingly, Defendants argue that the base percentage plus the fixed gratuity added together make up a total amount paid per job, or the "flat sum" per job.

Nothing in § 778.112 precludes a "flat sum" from having multiple components, as long as the compensation is paid on a per job basis.  _See Dufresne_, 207 F.3d at 268 (holding that plain language of the provision indicates that the principal requirement of § 778.112 is that the compensation be paid per job).  Further, the fact that the amount charged to customers, which then affects the amount paid to Plaintiffs, may depend on such a variable as the distance traveled for a particular trip, does not render § 778.112 inapplicable, so long as the compensation is paid by the job.  _Dole v. Trusty_, 707 F. Supp. 1074, 1076 (W.D. Ark. 1989) (applying § 778.112 to truck drivers delivering milk where the compensation depended on the trip); _see also Herman v. Hector Nieves Transport, Inc._, 91 F. Supp.2d 435, 441-442 (D.P.R 2000) (applying § 778.112 to truck drivers delivering petroleum).  Here, in addition to the abundance of Defendants' evidence regarding the components of Plaintiffs' compensation, Plaintiffs' briefs and statement of facts essentially concede that they were paid on a per job basis.  For example, Plaintiffs themselves, not only testified but set out in their statement of facts that a "driver could perform two identical transfers back-to-back, one taking 2 hours and one taking 5 hours, and the driver would be paid the

same."  (Plaintiffs' SOF ¶ 9; *see also* Alba Deposition, Aug. 22, 2006 (stating that two identical jobs, one lasting two hours and one lasting seven hours, would pay the same.))  Thus, the record demonstrates that there is no genuine issue of fact that Plaintiffs were paid a "flat sum" on a per job or per trip basis similar to the truck drivers in *Dole* and *Herman*.[13]

_____(ii)    *Fixed Gratuity*

Further, the 20% gratuity paid by the Defendants to the Plaintiffs does not constitute "other compensation" under the regulation.  Sections 531.50 through 531.60 of Title 29 of the Code of Federal Regulations regulate payment of wages to tipped employees.  Subsection 531.55(a) makes clear that "[a] compulsory charge for service, such as 10 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to the employee, cannot be counted as a tip received in applying [the term "wage" under the FLSA.]"  *Foody v. Carey International, et al.*, (04-21104-Civ-Ungaro-Benages, November 10, 2004, "Omnibus Order").  Thus, the fixed gratuities make up part of Plaintiffs' compensation and do not constitute "other form[s] of compensation" under § 778.112.

_____(iii)    *Fuel Surcharge*

The facts demonstrate that the fuel surcharge is not compensation for time worked, but rather a reimbursement for fuel expense.  As such, the fuel surcharge is not part of the Regular Rate and its payment does not render § 778.112 inapplicable.  *Brennan v. Padre Drilling Co.*, 359 F. Supp. 462 (S.D. Tex. 1973) and *Berry v. Excel Group, Inc.*, 288 F.3d 252 (5th Cir. 2002).  In

_____

[13] Plaintiffs argue that because Defendants gave estimated time of transfers based upon the time the passenger was expected to be in the car, it supports the position that Plaintiffs were paid by the hour. (Plaintiffs' SOF ¶ 9.)  Such conclusion is unfounded.  *See Aiken v. County of Hampton*, 1998 W: 957458, *4 (4th Cir. Sept. 22, 1998) (stating in reference to § 778.114 that "nothing in the regulations nor the case law suggests that requiring employees to keep track of hours worked" defeats their classification under the regulations).

*Brennan*, employees of an oil drilling company were paid a dollar per hour for expenses incurred during travel required by the employer.  359 F. Supp. at  463-64.  In *Berry*, an employee electrician worked for subcontractors and received a per diem daily payment.  288 F.3d at 253.  Both courts in these cases held that such amounts fell within 29 U.S.C. § 207(e) and its administrative interpretation in 29 C.F.R. §§ 778.216[14] and 778.217,[15] and were incurred by the employee on the employer's behalf and, thus, were not compensation for services for purposes of calculating the Regular Rate.  *Id.* at 466-67.

In this case, to the extent that Plaintiffs claim that Carey House Chauffeurs were paid the fuel surcharge,[16]  such amounts would not be categorized as compensation because Defendants

---

[14]  Section 778.216 states in relevant part that the term "regular rate" shall not be deemed to include reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer.

[15]  Section 778.217 states in relevant part:

(a) General rule.  Where an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses. Payments made by the employer to cover such expenses are not included in the employee's regular rate (if the amount of the reimbursement reasonably approximates the expenses incurred). Such payment is not compensation for services rendered by the employees during any hours worked in the workweek.

(b) Illustrations. Payment by way of reimbursement for the following types of expenses will not be regarded as part of the employee's regular rate:

[Sections 1 & 2 omitted]

(3) The actual or reasonably approximate amount expended by an employee, who is traveling "over the road" on his employer's business, for transportation (whether by private car or common carrier) and living expenses away from home, other travel expenses, such as taxicab fares, incurred while traveling on the employer's business.

[16]  It is unclear whether Carey House Chauffeurs received the fuel surcharge.  Defendants indicate that I/Os are paid the surcharge, but not the Carey House Chauffeurs.  (Sobol Decl. ¶ 23.)  However, Plaintiffs make the blanket statement that the "drivers were compensated by being given a fuel surcharge."  Thus, it is unclear whether Plaintiffs are referring to both I/Os and Carey House Chauffeurs or solely I/Os.

Page 14 of  34

were responsible for fueling the vehicle,[17] and if a Carey House Chauffeur paid for fuel out of pocket, the fuel surcharge paid to him was necessarily a reimbursement. Therefore, such payments are not used in the calculation of the Regular Rate.

With regard to the I/Os, however, the situation is less clear. After June 2004, customers were required to pay a fuel surcharge to offset escalating fuel prices. (Sobol Decl. ¶ 23.) These fuel surcharges were then paid to the I/O, who were contractually responsible for the payment of gas. (*See* Sobol Decl. ¶ 18.) To be a reimbursed expense excluded from the Regular Rate under the regulation, the employee must incur the expense on his employer's behalf or for the convenience of his employer. 29 C.F.R. § 778.217(a). Here, Plaintiffs incurred the expense of the escalated price of fuel for both themselves as independent contractors engaged in the limousine business as well as for Defendants in that the fuel was necessary to transport passengers on their behalf. Thus, it is not clear whether such payments of fuel surcharges falls within the parameters of § 778.217. However, the fact that the customer was charged the fuel surcharge and then the I/O was reimbursed for this expense make it akin to a toll or parking fee for which customers are billed and the I/O was reimbursed.

Also, payment of the fuel surcharge resembles the payment of the "per diem" in both *Brennan* and *Berry*. In *Brennan*, the defendants reduced the wage by an hour and paid the employees an extra dollar an hour to offset work-related travel expenses. The court found that such payments should not be included in the calculation of the Regular Rate. 359 F. Supp. at 466. The fuel surcharge the I/Os received in this case was almost identical to the per diem rate in

_____

[17] Defendants had complete responsibility for maintaining the vehicle in working order, for cleaning the vehicle, and for fueling the vehicle. (Sobol Decl. § 11.)

*Brennan* in that it was a flat sum to offset travel expenses.  Further, in *Berry*, the court found that

per diem amounts paid to an employee were reimbursed expenses for on-site living, utilities, meals

and other daily charges that the employee incurred so that he could be present at the work site.  288

F.3d at 254.  Here, the fuel surcharge reimburses Plaintiffs for escalating fuel prices.  Accordingly,

the fuel surcharge here is no different from the reimbursed expenses in *Brennan* and *Berry* and

thus, such payments are not "other form[s] of compensation" that renders § 778.112 inapplicable.[18]

    *(iv)*    *Payment for Standby Situations or "Site-Inspections"*

    Plaintiffs also argue that they received an "hourly rate" for standby situations, commonly

called "site inspections," which Plaintiffs allege constitute "other form[s] of compensation" under §

778.112.  (Plaintiffs' SJ Motion at 1-2, 4.)  Defendants, on the other hand, maintain that Plaintiffs

were paid by the job in these situations as well.  (Defendants Reply at 7.)  In support of their

contention that they were paid hourly for these jobs, Plaintiffs submit various documents and

deposition testimony.

It is necessary to review Plaintiffs' documents to determine if Plaintiffs were in fact paid

hourly for standby time.  A key document is the Driver Payment Report.  Plaintiff Betancourt's

May 16, 2002 to May 31, 2006 Driver Payment Report indicates that Betancourt was paid $40 for

various "Stand-By-Drive" assignments.  The report, however, does not indicate that the $40 was

---

[18]  Further, even if the fuel surcharge were considered compensation, it would not frustrate the application of § 778.112 because the surcharge is paid on a "per job" basis.  Defendants assert that I/Os are paid the surcharge on a per trip or per job basis similar to the manner in which the base percentage and fixed gratuity are paid.  (Sobol Decl. ¶ 18.)  Further, Plaintiffs also seem to group the fuel surcharge with the other two forms of compensation as indicated in the deposition of Plaintiff Mahoney, in which Plaintiffs' counsel states "[s]o at some time, it became three forms of compensation, the gratuity, the charge to the customer, a percentage, and the fuel surcharge," to which Mahoney responds, "Yes."  (Mahoney Depo., Oct. 12, 2006 at 64.)  The record is devoid of any suggestion that the fuel surcharge was paid in a manner other than on a "per job" basis.  Thus, even if the fuel surcharge was compensation, it does not prevent the application of § 778.112.

compensation for a certain number of hours worked.  (Betancourt Depo., Aug. 23, 2006, Exh. 11 -
CI 029512.)  Furthermore, in his deposition, when asked if the $40 was an hourly rate, Betancourt
stated "I recall that $40 was for like eight hours standby, eight to ten hours standby."  (Betancourt
Depo. at 208.)  It was only after Betancourt was asked whether he believed that he was being paid
roughly five dollars an hour, that he stated, "[a]round that if I say correctly."[19]  (*Id.* at 209.)
However, such testimony does not indicate that Plaintiffs were paid on a per hour basis.  Any job
can be calculated on per hour basis; the pivotal issue is if the job was <u>paid</u> on a "per hour" basis.
Here, the fact that Betancourt and Kralovic knew that they were paid $40 for a standby assignment,
but do not know for how many hours such payment constituted compensation, bolsters the
Defendants' argument that the $40 was paid on a per job basis.[20]   Moreover, Plaintiff Mazzeo
testified that he believed the $40 rate for standby jobs was consistent, regardless of the amount of
time spent doing the standby job.  (Mazzeo Deposition at 240-41.)  Thus, the statements of
Betancourt and Kravolic that they were paid on an hourly basis for stand-by assignments equates to
speculation as a matter of law, and not based on personal knowledge.[21]

_____(v)_      *Payments for Miscellaneous Occurrences*

_____Plaintiffs next argue that they received various miscellaneous payments that were paid by

---

[19]  Further, Plaintiff Viliam Kravolic also testified that he was paid $40 for a standby assignment.  However,
Mr. Kralovic testified that he would get a fare of $40 if he waited at the airport for two hours or more.  (Kralovic
Deposition, July 19, 2006 at 238-89.)  Thus, Kravolic's testimony also indicates that he was not aware if he was paid
hourly for these assignments.

[20]  Plaintiffs argument is further diminished by the fact that all "Stand-By" payments on Betancourt's
"Driver Payment Report" were for exactly $40.  If these assignments were paid on an hourly basis, these amounts
would likely differ based upon the time of each assignment.

[21]  As mentioned, Fed. R. Civ. P. 56(e) requires that affidavits supporting or opposing summary judgment
be based on personal knowledge.  Here, Plaintiffs Betancourt and Kralovic clearly do not possess personal
knowledge of whether they were actually paid hourly for the stand- by assignments.

the hour, not the job, including: payments for wait times, payments if there was a problem on a particular trip, payments for garage to garage trips, and payments for no-shows or cancellations. As discussed below, none of these types of payments undermine the application of § 778.112.

In support of the assertion that payments for excessive wait times were on a per hour basis, Plaintiffs submit the testimony of Plaintiffs Pereira and Humphreys.  (Plaintiffs Response at 8; Plaintiffs SOF ¶ 17.)  Pereira speculates that he may have been paid hourly for wait times, but when asked if he was paid an hourly fee or a flat fee, he says "I don't know."  (Pereira Depo., Sept. 20, 2006 at 242.)  Humphreys also indicated he is unaware of how he was paid for wait times when he states "I believe I get a slice of that hour that they're waiting."  (Humphreys Depo. Sept. 29, 2006 at 102-03.)  Accordingly, Plaintiffs have not provided evidence based on personal knowledge that they were paid hourly for wait times.  *See* Fed. R. Civ. P. 56(e).

_____To support the proposition that they were paid by the hour when problems arose, Plaintiffs offer the testimony of Plaintiff McIntyre.  McIntyre testified about a situation where a customer complained about his performance and he was not given his compensation.  (McIntyre Depo., July 27, 2006 at 220-21.)  Then, two months later, he was given $15 for the job.  McIntyre's testimony does not indicate that he was paid hourly in this situation and the fact that he received a flat amount without regard to time actually evidences that he was compensated by the job.

Plaintiffs also submit the testimony of Humphreys[22] in support of their argument that Plaintiffs were paid hourly for longer trips.  However, a review of the relevant testimony indicates just the opposite.  Humphreys testified regarding a pickup in Orlando that "if they just did it

---

[22]  In their Statement of Facts, Plaintiffs attribute the testimony to Plaintiff McIntyre, however, upon review, the relevant testimony is that of Plaintiff Humphreys.

hourly, it would cost you three hours to go from here to Orlando, which would be $215, but we charge $450 to take someone from here to Orlando, because they have it figured in the price, the return, and everything." (Humphreys Depo. 148-49.) Humphreys then testifies that with respect to such job, that he was paid for the time that there was no customer in the car. Clearly, this indicates that Defendants charged $450 for the job, and Plaintiff was paid for the whole job, whether the passenger was in the car or not.

Finally, Plaintiffs state that they were paid extra money, sometimes an hourly rate, for no-shows or cancellations. To the extent that the Plaintiffs were paid a flat amount to compensate for such no-shows or cancellations, such fact does not change the fact that Plaintiffs were paid by the job. However, if Plaintiffs were paid hourly, that could be considered "other form[s] of compensation" under § 778.112. Plaintiffs submit the testimony of Plaintiffs Zapata and McIntyre. Zapata makes no statement insinuating that he was paid hourly for no-shows or cancellations and McIntyre only makes the statement that he was paid $45 dollars for eight hours, not that he was paid hourly. (Zapata Depo. At 111-12; McIntyre Depo. 122, 159-60.) Such payments do not support Plaintiffs contention that they were paid in any manner other than by the job.

(vi)     *Payments for "As Directed" Jobs*

Plaintiffs' final assertion that the compensation for "as directed" jobs makes § 778.112 inapplicable is not persuasive. In *Foody*, Judge Ungaro-Benages addressed this issue explicitly, stating that the fact Defendants charged customers on an hourly basis does not mean that Plaintiffs were paid on an hourly basis. Rather, Plaintiffs were still compensated for these "as directed" trips on the same, per-job basis as all other trips. This Court agrees with Judge Ungaro-Benages well reasoned analysis and conclusion, and thus, holds that payment for "as directed" jobs does suspend

the application of § 778.112.

5.    Computation Of The Regular Rate Under § 778.112

Because § 778.112 applies to the facts of this case, the next step is to calculate the regular rate by totaling the sums received for each job during the workweek and "dividing by the total hours actually worked."  Thus, each Plaintiff's Regular Rate is equal to the total amount paid for all jobs in a workweek, divided by the total hours spent actually working on Defendants' behalf, i.e. the total number of hours spent driving customers and any additional time spent on tasks which may be found to be compensable.[23]

Plaintiffs invite the Court to calculate the Regular Rate by dividing the total compensation per workweek only by the time when customers are in the car, which they argue is consistent with § 778.109.  As stated above, Section 778.109 computes the regular rate by dividing a worker's Weekly Pay by the total number of hours actually worked during the workweek for which compensation was paid.  By claiming that they were only compensated when customers were in the car, Plaintiffs seek a denominator that is significantly smaller than the total of the time spent on each job plus the time spent for additional compensable activities.  Application of this formula would yield a higher Regular Rate.

Plaintiffs, however, do not explain why they should be entitled to add up only the time spent driving customers on each job for purposes of calculating the Regular Rate, while including the additional time spent on other compensable tasks for purposes of determining the total amount of time during each week for which Plaintiffs are entitled to be compensated.  This result would not only be inequitable, but also inconsistent with the terms of § 778.109, which refers the reader

_____

[23] This approach is consistent with the terms of § 778.112.

Page 20 of  34

to § 778.112 for an example of the "proper method of determining the regular rate of pay in particular instances."  Section 778.112, by design, squarely anticipates the situation in these cases through its reference to the total hours actually worked, rather than the total hours for which compensation was paid, and allows the Court to reconcile Plaintiffs' payment on a per job basis with the fact that Plaintiffs are entitled to compensation for time spent on tasks other than those for which they were paid.

 6. Defendants are Entitled To Net Out Expenses Prior To Calculating The Regular Rate.

Defendants also state that in determining the Regular Rate for I/Os, all sums must be excluded from compensation which are reasonably calculated to reimburse that employee for tolls, parking fees and fuel surcharges incurred in connection with work.  Consistent with the terms of §§ 778.216 and 778.217, these expenses which the I/O pays and for which he is reimbursed should not be used in the calculation of the Regular Rate.  As discussed *supra*, § 778.217(a) states that "where an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses.  Payments made by the employer to cover such expenses are not included in the employee's regular rate."  To the extent Carey House Chauffeurs were reimbursed for the expenses they paid out of pocket, such payments should not be included in the calculation of the Regular Rate.

With regard to I/Os, the question is more complicated because the I/Os must pay for all expenses associated with the operation of their vehicles operation.  (Sobol Decl. ¶ 18.)  A reasonable conclusion might be that the I/Os incur these expenses on behalf of themselves as independent businesses rather than for the benefit of Defendants.  However, a finding that such

expenses should be included in the calculation of the Regular Rate would have the unintended result that hourly rates are higher if a particular trip involves more of these expenses.  For example, if toll expenses were not netted before the Regular Rate was calculated, a passenger trip that arbitrarily required travel on many tolled highways would result in a greater Regular Rate because the Weekly Pay would increase by the amount of the extra tolls, thereby, increasing the hourly rate. On top of that, the driver would also be reimbursed for the extra toll expenses.  Thus, not only would the driver be repaid for his out of pocket toll expenses, but the extra toll payments would increase his Regular Rate.  Furthermore, although the I/Os benefitted their business in paying these tolls, parking and gas expenses, the primary beneficiary was Defendants whose business depended on the trips that Plaintiffs performed for them.  Finally, if the customers were to reimburse the I/Os directly for these expenses and not involve Defendants as an intermediary, such amounts would not be considered compensation.  Thus, it follows that making the Defendants the collection agent for these expenses should not alter the effect that these payments have on the Regular Rate. Accordingly, Defendants are entitled to net out the expenses for parking, tolls and the fuel surcharges that they received from the customer and paid out to the I/Os.

### B.      Compensable Working Time Under The FLSA

Having decided that Plaintiffs' overtime compensation should be calculated based on the flat fee per job, net of reimbursed parking fees, tolls and fuel surcharges, it is necessary to determine which activities are compensable under the FLSA to calculate the hours worked in a workweek.  Plaintiffs assert that compensable activity under the FLSA includes any activity or inactivity "required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  Specifically, Plaintiffs claim that the following activities are

compensable under the FLSA:[24] (1) home to work commutes; (2) cleaning, inspecting and maintaining the vehicles; (3) obtaining and placing amenities in the vehicle; (4) putting on and taking off uniforms; (5) calling dispatch to get assignments and flight times; (6) driving between jobs and mandatory meetings; and (7) waiting time to pick up passengers.  The Court addresses each of these activities below.

     1.    <u>Home To Work Commutes</u>

      Plaintiffs claim there daily commute is compensable because the Portal-to-Portal Act,[25] which provides that ordinary home-to-work and work-to-home travel is not usually compensable, does not apply because Plaintiffs' drive to the work site occurs after they commence their principal activity or activities.  (Plaintiffs' SJ Motion at 6.)  Plaintiffs claim that they engage in numerous work activities prior to commuting to work, such as: washing, cleaning and inspecting their vehicles; obtaining and placing amenities for customers in the vehicle; and other preparatory tasks. (*Id.* at 5.)  The Employee Commuting Flexibility Act ("ECFA"), 29 U.S.C. § 254(a), which amended the Portal-to-Portal Act, provides that the following activities are not compensable:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity.

---

[24]  Plaintiffs list as compensable time the period spent driving customers from one location to another. Because the compensability of this time is not in dispute given that it is the principal activity of the occupation, the Court has omitted it from the list.

[25]  The Portal-to-Portal Act amended the FLSA.  29 U.S.C. § 254(a).

To determine whether activities prior to commencing work are preliminary, the courts look to whether they are an integral and indispensable part of the principal activity. *Steiner v. Mitchell*, 350 U.S. 247 (1956); *Dunlop v. City Elec., Inc.*, 527 F.2d 394 (5th Cir. 1976); *Marshall v. Gerwill, Inc.*, 495 F. Supp. 744 (D. Md. 1980). However, even if the activities qualify as integral, if they are *de minimus*, the are not compensable. *Dunlop*, 527 F.2d at 400-01; *Marshall*, 495 F.Supp. 749.[26]

Here, it is not necessary to make those determinations to rule that commuting time is not compensable. Despite Plaintiffs' efforts to start the workday with these activities, even if they were compensable, there is nothing in the statutes, regulations, or case law to suggest that they could operate to make the subsequent drive to the principal activity anything other than non-compensable commuting time under the Portal-to-Portal Act. The Plaintiffs could choose to perform these activities anywhere on the path to the principal activity, or at the employer's place of business, and they cannot make their commute compensable by choosing to do them at home. Regardless of where they perform these activities, and regardless of whether they are compensable, the drive from home to the place of performance of the principal activity is excludable under 29 U.S.C. § 254(a).[27]

2.     Vehicle Cleaning, Inspection And Maintenance

Plaintiffs also claim that time spent cleaning, inspecting and maintaining their vehicles is

---

[26]   In *Lindow v. U.S.*, 738 F.2d 1057, 1062-64 (9th Cir.), the Ninth Circuit set forth a useful test of *de minimus* activities: (1) the amount of daily time spent on additional work; (2) the administration difficulty in recording the time; (3) the size of the aggregate claim; and (4) the regularity of the work.

[27]   It is also not significant that the employees do not go to the same place every day to begin their workday. *Kavanaugh v. Grand Union Co., Inc.*, 192 F.3d 269, 272 (2d Cir. 1999) (holding that the fact that an employee had to travel to different work sites did not make the commute compensable).

compensable time.  Defendants claim that these activities are considered preliminary or

postliminary under the ECFA and are therefore not compensable.  The analysis for determining

whether the activities are compensable will differ between the Carey House Chauffeurs and the

I/Os.  With regard to the I/Os, the answer is simple.  Because the I/Os own or lease their vehicles,

they are responsible for all expenses associated with them.  (Sobol Decl. ¶ 18.)  This includes gas,

licences, maintenance & repairs, parking, traffic citations and permits.  (*Id*.)  Therefore, it logically

follows that while conducting these activities was necessary to the performance of Defendants'

work, because the I/Os own or lease the vehicles, the time spent doing these activities is

predominantly in the Plaintiffs' own interests.  *Dunlop*, 527 F.2d at 398-99.  Thus, the time taken

to complete such tasks is not compensable.

The same analysis, however, does not apply to the Carey House Chauffeurs because they

drive vehicles owned by the Defendant.  The House Report accompanying  the ECFA states that "it

is not possible to define in all circumstances what specific tasks and activities would be considered

'incidental' to the use of an employers [sic] vehicle for commuting. . . . Routine vehicle safety

inspections or other minor tasks have long been considered preliminary or postliminary activities

and are therefore not compensable." H.R. Rep. No. 104-585 (1996); *see also Aiken v. City of

Memphis*, 985 F. Supp. 740, 744 (D. Tenn. 1997).  Here, there is a factual question regarding the

extent of cleaning, inspection and maintenance activities that Defendants required the Carey House

Chauffeurs to perform.  Thus, it is impossible to determine from the present record whether, and

which, activities may have been *de minimus*.  Accordingly, summary judgment as to whether the

cleaning, inspection and maintenance activities of Carey House Chauffeurs is compensable is

denied.

3.      Obtaining And Placing Amenities In Vehicles.

As stated above, the compensability of time spent on activities prior to commencing work, such as obtaining and placing amenities in a vehicle, depends on whether they are integral and indispensable to the principal activity.  The *Dunlop* court explained that the Portal-to-Portal Act was intended to exclude activities predominantly spent in the employee's own interests, not required by the employer and not necessary for performance of the employer's work.  *Dunlop*, 527 F.2d at 398-99, 401.

Based on the record, the Court cannot say that one party or the other is entitled to judgment as a matter of law with regard to these activities.  There is a factual question as to the regularity of the activities, whether the employer required some of these actions, and whether the employee performed them for his own benefit, e.g., to enhance his ability to get cash tips or repeat business. In addition, it is impossible to determine from the record whether, and which, activities may have been *de minimus*.  Thus, summary judgment as to the compensability of the time used to obtain and place amenities in a vehicle is denied.

4.      Putting On And Taking Off Uniforms.

Plaintiffs further argue that time spent putting on and taking off their uniform is compensable.  Plaintiffs' argument is without merit.  Section 789.7(g) expressly provides that:

> Other types of activities which may be performed outside the workday and, when performed under the conditions normally present, would be considered "preliminary" or "postliminary" activities, include checking in and out and waiting in line to do so, *changing clothes*, washing up or showering, and waiting in line to receive pay checks.

29 C.F.R. § 789.7.  While the regulations state that there are specific situations where changing clothes would be so integral to the performance of the principal activity, the situation here does not

fall into that category.  *See Steiner*, 350 U.S. at 256 (holding that changing clothes was an integral and indispensable part of the principal activity where the plaintiffs worked at a battery plant with caustic and toxic materials.)  Thus, the time Plaintiffs spent changing into and out of their uniforms is not compensable.[28]

  (5) Time Spent Calling Dispatch To Get Assignments And Flight Times.

  Plaintiffs argue that time spent calling dispatch to get assignments and flight times is compensable.[29]  This determination cannot be made as a matter of law.  There is a factual question as to whether the time spent doing these activities is *de minimus,* specifically, how much time is spent calling dispatch or checking flight times, and what is the regularity with which Plaintiffs are required to do it.  *See Lindow*, 738 F.2d 1062-64.  Thus, whether Plaintiffs are entitled to compensation for these activities cannot be addressed on a summary judgment motion.

  6. Driving Between Jobs And Mandatory Meetings.

  Driving from one job to another is clearly compensable, and is not excludable under the Portal-to-Portal Act.  29 C.F.R. § 785.38 (stating that time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked; 29 C.F.R. 790.7(c) (stating that the non-compensability of commutes does not

---

[28]  Moreover, there is also support for the proposition that time spent changing clothes is *de minimus*. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946).

[29]  In contrast, Defendants argue that contacting dispatch during a Plaintiffs daily commute does not make the whole commute compensable.  Merely receiving instruction from the employer is not enough to render the time spent in a commute compensable.  *Vega ex rel. Trevino v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) (holding that getting instructions as to where Plaintiffs would work and how much they would be paid did not make the commute time compensable); *see also Bartholomew v. City of Burlington*, 5 F. Supp. 2d 1161, 1169-70 (D. Kan. 1998) (holding that getting briefings during a daily commute did not render the entire commute compensable).  Thus, even if Plaintiffs called dispatch and checked flight times during their daily commute, the entire commute time is still not compensable.

apply to travel from the place of performance of one principal activity to the place of performance of another, nor does it include travel during the employee's regular working hours).  Thus, time spent going from one job to another is compensable as a matter of law.

The time spent attending mandatory meetings is also compensable as a matter of law.  Time spent at training programs and meetings is not compensable if: "(1) attendance is outside the employee's regular working hours; (2) the employee does not perform productive work during the program; (3) attendance is voluntary; and (4) the program is not directly related to the employee's job."  *Dade County, Fla. v. Alvarez*, 124 F.3d 1380 1384 (11th Cir. 1997) (citing to 29 C.F.R. § 785.27.  Here, to the extent Defendants required Plaintiffs to attend meetings, the time spent in such meetings is compensable.[30]

      *7.*     <u>Wait Times.</u>

There are several different forms of waiting time: waiting for a late customer, instances in which an employee is "engaged to wait," and those in which an employee is "waiting to be engaged."  The time spent waiting for a late customer and being "engaged to wait" are compensable as these activities are integral and indispensable to the principal activity of transporting customers.  The category of "waiting to be engaged," that is, essentially being "on call" may be compensable under certain circumstances.

The Supreme Court has established the general parameters of the "waiting to be engaged" doctrine in *Armour & Co. v. Wantock*, 323 U.S. 126 (1944) and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  The general rule emerging from these cases is that if the waiting time is spent

---

[30]  Plaintiffs include "mandatory meetings" in the title of Section III of their summary judgment motion, but make no other reference to any specific or routine meetings that Plaintiffs were required to attend.

primarily for the benefit of the employer, it is compensable.  Whether the time is spent for the

employer's benefit is "dependent upon all the circumstances."  *Armour*, 323 U.S. at 133; *Skidmore*,

323 U.S. at 136-37.  The Supreme Court did not attempt to describe such circumstances.  Later

decisions have fleshed out the rule, utilizing a standard of how much restraint is placed on an

employee who is "waiting to be engaged."

 The degree of restrictions placed on an employee who is "on call" usually determines

whether such time is compensable.  Various formulations have been adopted, but generally they are

decided on the basis of whether the employee is free to use such "on call" time for his own

personal activities.  *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 808-10 (11th Cir.1992).[31]  In

*Lurvey v. Metro. Dade County*, 870 F.Supp. 1570, 1576 (S.D. Fla. 1994), the Court enumerated a

non-exhaustive list of factors that could be analyzed in determining the extent to which an "on call"

employee is free to engage in personal activities, including:

> (1) whether there was an on-premises living requirement; (2) whether there were
> excessive geographical restrictions on employee's movements; (3) whether the
> frequency of calls was unduly restrictive; (4) whether a fixed time limit for response
> was unduly restrictive; (5) whether the on-call employee could easily trade on-call
> responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether
> the employee had actually engaged in personal activities during call-in time. ...

*Lurvey*, 870 F.Supp. at 1576 (citing *Owens v. Local No. 169, Ass'n of Western Pulp and*

*Paper Workers*, 971 F.2d 347, 351 (9th Cir.1992)).  "'Such a list is illustrative, not

exhaustive.  No one factor is dispositive.'"  *Id*.  The factual support for the foregoing factors

have not been developed in the record thus far.  Thus, summary judgment as to this type of

---

[31] In *Birdwell*, the Eleventh Circuit outlined the factors that courts should consider as follows: "... (1) the agreements between the particular parties, (2) appraisal of their practical construction of the working agreement by conduct, (3) consideration of the nature of the service, and its relation to waiting time, and (4) all of the surrounding circumstances."  *Id.* at 808.

waiting time is not warranted.

Accordingly, the time waiting for late passengers is compensable, as it is time in which an employee is "engaged to wait."  In contrast, there is a factual dispute as to whether the time spent "waiting to be engaged" is compensable.[32]

### C.    Plaintiffs Are Not Entitled To Social Security Payments

In the FAC, Plaintiffs include in their prayer for relief "the Defendants half of Plaintiff's social security liability that they failed to pay the federal government."  It is difficult to ascertain exactly what Plaintiffs are seeking, but it appears that they are arguing that because they received 1099s, were classified as independent contractors and have already paid the full Federal Insurance Contributions Act ("FICA") tax, they are seeking the portion of the FICA tax that Defendants would have paid had they been treated as employees.  Plaintiffs' prayer for such relief must be denied.  The Eleventh Circuit has expressly held that neither the text, structure nor legislative history of FICA creates by implication a private cause of action.  *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 726 (11th Cir. 2002).  In *McDonald*, Plaintiff sued his former employer for a violation of FICA because the employer designated Plaintiff as an independent contractor and therefore did not make any FICA contributions on the employee's behalf.  The Eleventh Circuit affirmed the dismissal of the plaintiffs lawsuit because it determined that Congress did not intend to create a private right of action under FICA for such sums.  *Id.* at 726.

---

[32]  The Court is unable to discern if the Plaintiffs seek summary judgment for the time spent waiting on passengers that resulted in "no-shows" or cancellations.  Plaintiffs make the general conclusion that "waiting time" is compensable, but do not distinguish between the different types of wait times.  However, an employer who dispatches an employee to pick up a customer who never shows should expect to pay its employee for the time spent waiting for the customer.  *See e.g. Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923 (11th Cir.1987) (requiring processing plant to compensate employees for time they spent waiting while assembly line was down and being repaired).

The facts here are identical to those in *McDonald*.  Thus, Plaintiffs cannot collect social security payments as a matter of law.

      **D.**    **Compensatory Damages Are Unavailable For FLSA Overtime And Minimum Wage Claims.**

Plaintiffs also seek compensatory damages for alleged mental distress in connection with their overtime and minimum wage claims.  Defendants argue that such damages are not allowed under the FLSA as a matter of law, and therefore, they are entitled to summary judgment as to this issue.  This issue already was addressed in *James v. Wash Depot Holdings, Inc.*, Case No. 05-60822-Civ-Dimitrouleas.  In that case, the court held that the FLSA does not allow for recovery of compensatory damages under the FLSA.  This Court agrees.

Although, the FLSA is a remedial statute, and it must be interpreted broadly, its reach is still cabined by the statutory language.  *Tennessee Coal, Iron & RR Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597-98 (1944).  Section 216(b) of the Act specifies the remedies available for minimum wage claims (Section 206) and overtime claims (Section 207) as follows:

> Any employer who violates the provisions of section 6 or section 7 of this Act [29 USCS §§ 206 or 207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

This provision does not allow recovery of compensatory damages for emotional distress. *See Vasquez v. E. Air Lines, Inc.*, 579 F.2d 107, 110 (1st Cir. 1978); *Bolick v. Brevard County Sheriff's Dep't*, 937 F. Supp. 1560, 1566 (M.D. Fla. 1996); *EEOC v. Local 350, Plumbers and Pipefitters*, 842 F. Supp. 417, 422 (D. Nev. 1994)*; Hybki v. Alexander & Alexander, Inc.*, 536 F. Supp. 483, 484 (W.D. Mo. 1982).  Thus, Defendants are entitled to summary judgment as a matter

of law as to Plaintiffs' prayer for compensatory relating their claims for minimum and overtime wages.

**E.    Defendants Are Not Entitled To Summary Judgment Regarding Plaintiff Powell's Retaliation Claim.**

Plaintiff Powell also seeks damages for retaliation under the FLSA.  Defendants argue that such damages are not permitted as a matter of law.  In addition to provisions regarding the minimum wage and overtime wages, the FLSA also incorporates an anti-retaliation provision. Section 215(a)(3) prohibits employers from discharging or discriminating against any "employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. 215(a)(3).  Section 216(b) authorizes private causes of action against employers for violation of the FLSA and describes the relief afforded to a successful plaintiff:

> Any employer who violates the provisions of section 15(a)(3) of this Act shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 15(a)(3), including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).

The damages a court may impose against an employer who retaliates appear to be more expansive than with overtime claims, as the provision includes the language "any legal or equitable relief as may be appropriate to effectuate the purposes of § 215(a)(3)." *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 933 (11th Cir. 2000).  In *Snapp*, the Eleventh Circuit found that § 216(b) did not expand the damages to punitive damages, but limited them to compensatory damages.  In short, the Court of Appeals found that "liquidated damages" referred to those

damages that were meant to "compensate the plaintiff." *Id.* at 934.  Thus, Defendants motion for summary judgment as to Powell's efforts to seek compensatory damages for retaliation must be denied.

## IV.     CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that

(1)     Defendants' motion for summary judgment regarding the issue of damages [DE 272] is GRANTED IN PART AND DENIED IN PART, as set out in paragraphs 3-9 below.

(2)     Plaintiffs' motion for summary judgment regarding the issue of damages [DE 274] is GRANTED IN PART AND DENIED IN PART, as set out in paragraphs 3-9 below.

(3)     The parties shall calculate overtime wages pursuant to 29 C.F.R. § 778.112.  In calculating the Weekly Pay, the expenses for tolls, parking and fuel surcharges that were paid by the customer and reimbursed to the Plaintiffs shall not be included.

(4)     Plaintiffs are entitled to be compensated for time spent driving with customers in the vehicle, driving between jobs,  attending mandatory meetings, time spent waiting for customers or being engaged to wait, and time spent waiting for no-shows or cancellations.

(5)     Plaintiffs are not entitled to be compensated for commutes between work and home and time spent changing clothes.  Further, the I/Os are not entitled to compensation for time spent cleaning, inspecting or maintaining their vehicle.

(6)     The parties' motions for summary judgment regarding the compensability of the following activities is denied: the time Plaintiffs spent obtaining and placing amenities in vehicles; the time that Carey House Chauffeurs spent cleaning, inspecting and maintaining the Defendants'

vehicles; the time Plaintiffs spent calling dispatch and checking flight times; and the time spent

Plaintiffs spent "waiting to be engaged."

    (7)    Plaintiffs are not entitled to social security payments as a matter of law.

    (8)    Plaintiffs are not entitled to compensatory damages for their overtime claims as a

matter of law.

    (9)    Plaintiff Powell may seek compensatory damages for his retaliation claim.

    DONE and ORDERED at Miami, Florida, this <u>1st</u> day of February, 2007.

                                    PATRICIA A. SEITZ

                                    UNITED STATES DISTRICT JUDGE

cc: Counsel of Record